**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JACOB TOLBERT, | ) | |
| | ) | Case No. 23-cv-05626 |
| Plaintiff, | ) | |
| | ) | Judge Sharon Johnson Coleman |
| v. | ) | |
| | ) | |
| CITY OF CHICAGO, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff, Jacob Tolbert ("Plaintiff") brings this action against Detective Thomas Hanrahan ("Detective Hanrahan"), Detective Michael Bouch ("Detective Bouch "), and the City of Chicago ("City") (altogether, "Defendants") in connection with his arrest and pre-trial incarceration for a shooting that occurred on June 24, 2017. After being acquitted of all charges on May 26, 2023, Plaintiff brought unreasonable pretrial detention and malicious prosecution claims against Detective Hanrahan and Detective Bouch (Count I) and a state malicious prosecution claim against all Defendants (Count II) pursuant to 42 U.S.C. § 1983. Presently before the Court is Defendants' Motion for Summary Judgment [80]. For the following reasons, the Court denies Defendants' Motion.

I.      **Background**

   A. **Factual Allegations**

The following facts are not in dispute unless otherwise noted.

   a. *Shooting of Hakeem Howard*

On June 24, 2017, Chicago police officer Michael Reyes ("Officer Reyes") heard what he believed to be a gunshot while stopped at a red light at 3758 West Chicago Avenue ("Chicago Ave.") in the West Humboldt Park neighborhood. When he looked toward the sound, he saw a group of men walking and running on Chicago Ave. toward North Hamlin Avenue ("Hamlin Ave."). After

1

surveying the scene, Officer Reyes found a male lying face down on the floor of Maxine's Beauty Shop ("Maxine's"), which is on Chicago Ave. between Hamlin Ave. and North Avers Avenue ("Avers") . The male's name was Hakeem Howard ("Howard"). He had been shot.

Detective Hanrahan was dispatched to the scene of the crime with Chicago Detective Hector Matias ("Detective Matias"). Detective Hanrahan spoke with Officer Reyes, the first officer on scene, who told him what he had observed. Detective Matias also spoke with an anonymous citizen who identified Plaintiff as the shooter. Plaintiff argues, however, that during the initial part of their investigation, detectives did not have any eyewitnesses to the shooting, that detectives did not know if the person claimed to have personally witnessed the shooting, and that the person did not indicate where they were when the shooting occurred.

    *b. Investigation*

        i.    Video Footage

After speaking with Officer Reyes, Detective Hanrahan searched the area for video evidence. Detective Hanrahan identified a Chicago Police Observation Device ("POD") camera on Hamlin Ave. and Chicago Ave., as well as surveillance cameras by two nearby businesses on Chicago Ave., Chicago Best Burrito, a Mexican restaurant, and Avers Place, a tobacco shop.

The POD camera showed a man wearing a long-sleeved shirt walking on Hamlin Ave. The man then turned on Chicago, out of the POD camera's view. Shortly thereafter, the POD camera captured the man walking back to Hamlin Ave. and entering the passenger seat of a silver car, which drove south and then out of the POD Camera's view. Detective Hanrahan states, in his opinion, that the man depicted in the POD Camera footage was holding his right pant leg at various points in while he was walking back and forth, which, in Detective Hanrahan's experience, is indicative of someone walking with a concealed, weighted object, such as a firearm.

The Chicago Best Burrito footage shows the same man walking back and forth between Hamlin Ave. and Chicago before entering the passenger seat of the silver car. This footage, which is

2

less grainy than the POD footage, shows that the man is wearing a plaid shirt. The Avers Place footage, from a different angle, shows an unidentified man reach into a bag, interact with some people, and then walk on Chicago toward Maxine's. After the individual walked away, a group of men, including the man in the plaid shirt, approached the area where the unidentified man was previously standing. The man in the plaid shirt then walks on Chicago toward Maxine's, where Defendants maintain, he was involved in an altercation with the victim, Howard, and other people. Defendants next assert that the same man in the plaid shirt reached to the ground, stood back up, possibly with an object, and extended his right arm in front of him. Shortly thereafter, the man in the plaid shirt and one other unidentified individual ran towards Hamlin Ave. Howard was later found shot at the scene. Howard eventually died from his wounds on June 27, 2017.

> ii. Buy/Bust Operation

Detective Hanrahan's investigation stalled when he could not identify an eyewitness to the shooting. To move the investigation forward, Detective Hanrahan initiated a written request for a "buy/bust" operation[1] with the narcotics unit of the Chicago Police Department in Bridgeport, with the goal of identifying a witness to the homicide. The buy/bust operation was assigned to Sergeant Nicholas Orlando ("Sergeant Orlando") who was directed to contact Detective Hanrahan. After Sergeant Orlando contacted him, Detective Hanrahan compared Plaintiff's booking photo from a previous arrest to the video footage from Chicago Best Burrito and determined that the man wearing the plaid shirt in the video footage resembled Plaintiff. Detective Hanrahan showed the footage from Chicago Best Burrito to Detective Staunton, who previously arrested Plaintiff, and Detective Staunton said he recognized the man in the plaid shirt as Plaintiff. Through his investigation Detective Hanrahan also learned that the silver vehicle depicted in the video footage from Chicago Best Burrito

---

[1] A law enforcement tactic where undercover officers pose as buyers to purchase illegal substances or goods, leading to the immediate arrest of the seller.

was located at Plaintiff's grandmother's house. Detective Hanrahan went to address and spoke with Plaintiff's grandmother, who stated that Plaintiff was not home. After this visit, on June 29, 2017, Detective Hanrahan issued an investigative alert with probable cause to arrest Plaintiff for murder.

### iii. Electronically Recorded Interviews

#### 1. Samuel Whitehead

In order to identify witnesses, Detective Hanrahan searched a database listing individuals who had been arrested on the block where the shooting occurred and compared the booking photos of some of those individuals to the individuals depicted in the footage from Chicago's Best Burrito. Detective Hanrahan determined that the booking photo for Samuel Whitehead ("Whitehead") resembled one of the individuals depicted in the video. Detective Hanrahan informed other officers that he wanted to speak to Whitehead.

In an Electronically Recorded Interview ("ERI"), on August 8, 2018, Whitehead gave a statement to detectives and an assistant state's attorney. In that statement, Whitehead identified the man wearing the long-sleeved plaid shirt as Plaintiff. Whitehead stated that he was with his cousin, Robert Talbert ("Talbert"), in Talbert's girlfriend's grayish two door Monte Carlo. Whitehead stated that he and Talbert were parked on Chicago Ave. between Avers and Hamlin Ave. when a female approached them and told them that Plaintiff was in a fight. Whitehead stated that he saw Plaintiff standing on the sidewalk with a group of people. When he heard a gunshot, Whitehead ran away from the sound, toward his grandmother's house. When Whitehead arrived at his grandmother's house, he learned "people were saying that [Plaintiff] had just shot somebody."

#### 2. Joshua Woods

On August 9, 2017, Joshua Woods ("Woods") was riding his bike at the corner of Avers and Chicago Ave. when he was detained by Chicago Police Officers on suspicion of drug possession. He was searched by the officers, who did not find anything illegal on him, but still transported him to a

police station at West Harrison Streer and South Kedzie Avenue. Plaintiff was released without being charged pursuant to a procedure called "99 Confidential" where, in exchange for providing police offices with information, arrestees are released without charge. Later that day, the arresting officers notified Detective Hanrahan that Woods indicated he had information regarding the murder near Maxine's. Detective Hanrahan 's understood this to mean that Woods agreed to provide information in exchange for not being charged for drug possession. On August 10, 2017, Woods gave an electronically recorded statement to Detective Hanrahan, Detective Bouch, and an assistant state's attorney where Woods stated that he personally saw Plaintiff fire a gun. Detective Hanrahan reduced Woods' statement to writing, stating the same.

Woods' deposition testimony set forth other details of the meeting that contradicted the statements by the Detectives. Woods testified that the Detectives showed him photos of suspects and told him to say that he saw a fight break out, saw Plaintiff pick up a chrome revolver, and shoot Howard. Plaintiff argues that Woods was coached by the Defendants to implicate him. The fact that Woods was not visible in any of the surveillance footage was not documented in any written report by Detectives Hanrahan or Bouch.

### 3. Robert Talbert

On September 13, 2017, Talbert gave an electronically recorded statement to detectives and an assistant state's attorney. Talbert stated that he double-parked his girlfriend's grayish two door Monte Carlo between Hamlin Ave. and Avers when his cousin, Whitehead, got out of the passenger seat to speak to a woman. Talbert stated that when he got out of his car, he heard a "pop," and ran down the sidewalk on Chicago toward Hamlin Ave. Talbert stated that he saw Plaintiff when he was running. Talbert then ran back to his girlfriend's car, got inside, pulled up to the corner, and picked up Plaintiff. Plaintiff then asked Talbert to drop him off at North Harding Avenue and West Ohio Street . Talbert later learned there were rumors "on the streets" that Plaintiff was the shooter.

4. Plaintiff

Soon after Howard's shooting, Plaintiff went to visit his brother's home in Gary, Indiana. Around two weeks later, he turned himself in at Statesville Correctional Center for the parole violation of leaving the state. On September 13, 2017, Plaintiff was released from Statesville Correctional Center and immediately arrested for murder. At the police station that same day, Plaintiff gave a brief statement in which he stated that he had never seen Talbert's girlfriend's gray car and was not aware there had been a shooting on Chicago Ave. in June.

c. *Probable Cause Determinations*

On September 14, 2017, a prosecutor approved one count of first-degree murder after Detective Hanrahan gave the Cook County State's Attorney's Office all the videos and documents pertaining to the case. When the prosecutor approved the felony charge, he was not aware of anyone other than Woods claiming to have witnessed Plaintiff shoot Howard. During the bond proffer hearing, Assistant State's Attorney Jamie Santini ("ASA Santini") stated Plaintiff was seen fleeing the scene of the shooting with a gun and was identified by Woods as the person Woods shoot Howard. Immediately after ASA Santini made these statements to the court, it made a finding of probable cause, and at the state's request, ordered Plaintiff to be held without bond.

ASA Santini called Detective Hanrahan as a witness before a grand jury on October 10, 2017, for the purpose of indicting Plaintiff. Detective Hanrahan testified that Plaintiff was armed with a firearm, shot Howard, and that Woods identified Plaintiff as the shooter. Detective Hanrahan admits that his grand jury testimony was supported by Woods' statements.

d. *Woods' Recantation*

In or around July of 2019, Sarah Grgurovic ("ASA Grgurovic"), the new Assistant State's Attorney assigned to the case, learned that Woods admitted he did not witness the shooting of Howard. Woods told ASA Grgurovic that Detectives Hanrahan and Bouch told him who to identify

as the shooter.  Detective Hanrahan and Detective Bouch, however, later testified that they did not tell Woods what to say and did not witness anyone else tell Woods what to say.  The original prosecutor, the bond proffer judge, and the grand jury were never made aware of any information indicating that Woods was not present at the scene of the shooting, that Woods actually said anything different than the Detectives' summary of Woods statement, and were not informed of Woods assertion that Detective Hanrahan and Detective Bouch told Woods to identify Plaintiff as the shooter.

### e.   Continued Prosecution

As a general principle, prosecutors have substantial discretion to initiate and conduct criminal prosecutions.  *See Bordenkircher v. Hayes, 434 U.S. 357*, 364 (1978) ("[i]n our system, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in [their] discretion.")  When ASA Grgurovic reviewed the remaining evidence, she learned that none of the videos showed Plaintiff definitively holding an object that could be identified as a gun, that the videos did not show Howard when he was shot, and that the videos did not show a gun being fired.  She also learned that the only witness in the case that claimed to have seen Plaintiff shoot a gun at Howard was Woods.  Despite this lack of evidence and despite Plaintiff's guilt being discounted by Woods recantation, ASA Grgurovic decided to proceed with the prosecution.

ASA Grgurovic also participated in drafting an undated, internal memorandum to her supervisors in the State's Attorney Office documenting the scarcity of evidence surrounding the shooting.  In the memorandum, she and her co-author stated that the video footage is "too grainy" to see if the person who picked up an item and extended their arm was Plaintiff and that none of the videos show Plaintiff with a gun.  They also stated: "[t]he only other evidence in this case comes from our eyewitness, Joshua Woods, who came forward one month after the shooting only when he was

arrested…" They conclude that it is "problematic" that "Woods is not observed in any of the video surveillance which tends to support his argument that he wasn't even there."

At a December 1, 2021, hearing on a motion to suppress Woods' identification of Plaintiff as the shooter, Grgurovic called Detective Hanrahan to testify. Detective Hanrahan testified that Woods told him and Detective Bouch that he was standing 5 to 10 feet away from Howard when Plaintiff picked up a chrome revolver and fired one shot at Howard. At that hearing, ASA Grgurovic also stated that she intended to call Woods to testify in her case in chief. ASA Grgurovic ultimately decided, however, not to call Woods as a witness.

### f. Bench Trial

The bench trial occurred on May 8, 2023. On May 26, 2023, after hearing the parties' cases, Judge Sophia Atcherson found Plaintiff not guilty, stating there were no eyewitnesses, no admissions from Plaintiff and no physical evidence linking Plaintiff to the shooting. Judge Atcherson further stated Howard is not visible in the video, that there is no way to know where he was in relation to anyone else when he was shot, and that several individuals were seen running or walking away from the scene or making motions towards their waistbands, indicating possible weapons. She could not "say from the evidence presented here that there is proof beyond a reasonable doubt that Mr. Plaintiff is the person who shot [Howard]." Following this verdict, Plaintiff was released from custody, having served close to six years.

### B. Remaining Disputed Facts

Plaintiff raises objections to certain statements of fact proffered by Defendants on the basis that they are improper testimony or based upon inadmissible hearsay. "To be considered on summary judgment, evidence must be admissible at trial…" *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016). The Court therefore addresses the admissibility of the contested statements and determines how those statements can be considered for purposes of resolving this Motion.

###### a. Statements of Belief by Hanrahan and Grgurovic

Plaintiff takes issues with statements made by Detectives Hanrahan and Grgurovic regarding the video evidence from the day of Howard's shooting. Specifically, Defendants assert: "in Detective Hanrahan's opinion, the man with the long-sleeved plaid shirt appeared to be in an altercation with someone;" in Detective Hanrahan's and Detective Grgurovic's opinions "the man with the long-sleeved plaid shirt picked up an object when he reached to the ground; and in Detective Hanrahan's opinion "the arm bend depicted on video is consistent with the cant of a gun." Plaintiff asserts that such opinions cannot be offered because they are not based on Detective Hanrahan's and Detective Grgurovic's personal knowledge. While it is a well-established rule that witnesses who are not experts are permitted to testify only from their personal knowledge, *Visser v. Packer Eng'g Assocs., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991), officers making probable-cause determinations "are entitled to draw reasonable inferences from the facts before them, based on their training and experience." *United States v. Funches*, 327 F.3d 582, 586 (7th Cir. 2003). While the Court will not consider these statements for their truthfulness, the Court will consider them for purposes of determining whether the Detectives had probable cause, or at least arguably had probable cause, to arrest Plaintiff.

###### b. ERI Statements by Whitehead, Woods, and Talbert

Plaintiff additionally objects to facts proffered from ERI statements made by Whitehead, Wood, and Talbert, respectively referenced in Exhibits 12, 15, and 17. Plaintiff asserts that the statements derived from those transcripts contain inadmissible hearsay. Defendants, by contrast, argue that the transcripts are not being offered for the truth of the matter asserted, but instead for showing the effect those statements had on the Defendants. While the Court will not consider facts derived from the transcripts for the truth of the matters they assert, the Court will consider them in determining their effects on Defendants as it relates to their probable cause determinations. *See United*

*States v. Shaw*, 824 F.3d 624, 630 (7th Cir. 2016)(courts consider statements for the nonhearsay purpose of showing their effect on detectives for their probable cause determinations).

With these material issues addressed, the Court now turns to its ruling on the merits of Defendants' Motion.

## II.    Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party, and . . . draw[s] all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Logan v. City of Chicago*, 4 F.4th 529, 536 (7th Cir. 2021) (quotation omitted). After "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (quotation omitted).

## III.   Discussion

Section 1983 authorizes suits against police officers who violate constitutional rights while acting under color of state law. *See* 42 U.S.C. § 1983. A plaintiff may recover damages for Fourth Amendment violations based on arrests that lack probable cause at the outset, and for ensuing pretrial detention without probable cause. *See Manuel v. City of Joliet, Ill.*, 580 U.S. 357, 367 (2017). Relatedly, to prevail on a malicious-prosecution claim under Illinois law, plaintiffs must show that: "(1) [they were] subjected to judicial proceedings; (2) for which there was no probable cause; (3) the defendants instituted or continued the proceedings maliciously; (4) the proceedings were terminated in the

plaintiff[s'] favor; and (5) there was an injury." *Martinez v. City of Chicago*, 900 F.3d 838, 849 (7th Cir. 2018) (internal citation omitted).

The existence of probable cause is a defense to both Fourth Amendment and malicious prosecution claims. *Washington v. City of Chicago*, 98 F.4th 860, 863 (7th Cir. 2024). As such, the facts that are relevant to the determination of probable cause for the detention and malicious prosecution claims, are the same facts that are relevant to whether the officers had probable cause to arrest Esco v. City of Chicago, 107 F.4th 673, 677 (7th Cir. 2024). Consequently, this case turns on whether probable cause existed to originally arrest plaintiff, detain him in advance of his trial, and for his continued prosecution.

In their Motion, Defendants argue they are entitled to summary judgement for three reasons: (1) because the undisputed evidence demonstrates that the detectives had probable cause to detain Plaintiff, (2) because there is a rebuttable presumption of probable cause when a judge and grand jury make a determination that probable cause exists, which Plaintiff cannot rebut, and (3) because the detectives are, at least, entitled to qualified immunity on the federal claim. (*See* Dkt. 82 at *6.) Plaintiff by contrast, argues that summary judgement is inappropriate where, as here, the parties hotly dispute whether Detective Hanrahan and Detective Bouch coached the only eyewitness to identify Plaintiff as the shooter, lied to the prosecutors to approve charges, and made false proffers to the court. (Dkt. 94 at *1.) The Court addresses the merits of these arguments, in turn.

### A. Unreasonable Pre-Trial Detention Claim

Probable cause is a "common-sense inquiry requiring only a probability of criminal activity"; probable cause exists "whenever an officer . has enough information to warrant a prudent person to believe criminal conduct has occurred." *Leaver v. Shortess*, 844 F.3d 665, 669 (7th Cir. 2016) (quoting *Whitlock v. Brown*, 596 F.3d 406, 411 (7th Cir. 2010)). Because probable cause deals with probabilities

11

and depends on the totality of the circumstances, *Maryland v. Pringle*, 540 U.S. 366 (2003), "[i]t requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Muhammad v. Pearson*, 900 F.3d 898, 908 (7th Cir. 2018). As explained, officers making probable-cause determinations "are entitled to draw reasonable inferences from the facts before them, based on their training and experience." *Funches*, 327 F.3d at 586.

Defendants argue the Detectives' investigation uncovered facts, outside of Woods' contested identification, that readily established probable cause to believe that Plaintiff killed Howard and to arrest and detain Plaintiff for Howard's murder. (Dkt. 82 at *10). Specifically, Officer Reyes, the first officer on the scene told Detective Hanrahan that he heard a gunshot near Maxine's Beauty Shop and saw a group of men in a rush to leave the area, an anonymous citizen told Detective Matias that Plaintiff was the shooter, and video footage showed an individual, who Detectives believed to be Plaintiff, pick up an object in front of Maxine's Beauty Shop and extend his arm. (Dkt. 82 at *10). Additionally, the only car located at the scene was located at Plaintiff's grandmother's house, and Plaintiff's entry to that car after the shooting was corroborated by Talbert's ERI. *Id.* Defendants also maintain that additional evidence further bolstered probable cause, like Plaintiff fleeing to Indiana after the shooting and telling officers he was not aware that a shooting occurred despite multiple witnesses confirming he was at the scene of the crime. *Id.* The fact that one of the other individuals at the scene also could have been the shooter, Defendants argue, was irrelevant to their determination because they acted based on an in-person tip, corroborating video evidence, and witness interviews, that all independently established probable cause. (*See* Dkt. 101 at *10.)

Plaintiff, by contrast, asserts the "alleged tips, rumors, and opinions" were not based on first-hand knowledge and thus could not have supported probable cause. (Dkt. 94 at *10.) Plaintiff also argues the detectives' review and interpretation of video footage was not enough to infer that Plaintiff committed the offense. (*See Id.*) Plaintiff concludes, that defendant needed Woods' coached and false

ERI to make sense of the video and corroborate their alleged tips to support probable cause and detain plaintiff. (*See Id.*)

Considering the totality of the circumstances, the Court agrees with Defendants that they can support their probable cause determination at least for Plaintiff's initial arrest. Probable cause is " 'assessed objectively' based on 'the conclusions that the ... officer reasonably might have drawn from the information known to him.' " *Holmes v. Village of Hoffman Estates*, 511 F.3d 673, 679 (7th Cir. 2007). We look only at what the officer knew at the time he sought the warrant, not at how things turned out in hindsight. *Beauchamp v. City of Noblesville, Ind.*, 320 F.3d 733, 743 (7th Cir. 2003). Regardless of the outcome of the trial, at the time of the arrest, Defendants relied on their investigation at the crime scene, video footage of an individual who detectives believed to be Plaintiff, that the sole car from the scene was located at an address associated with Plaintiff, and corroborating interviews from individuals who were in the vicinity at the time. Notwithstanding Woods' contested identification, there remained enough reliable evidence to support probable cause for his original arrest. This point is further bolstered by the fact that Detective Hanrahan issued an investigative alert with probable cause to arrest Plaintiff prior to Woods making his statement.

This finding does not, however, entitle Defendants to summary judgment on any claim that Plaintiff was unreasonably detained for six years after his initial arrest due to Defendants' alleged fabrication. His recovery is not foreclosed just because the Defendants' established probable cause for his original arrest, he can also recover damages for "ensuing pretrial detention without probable cause." *Manuel*, 580 U.S. at 367. This is because fabricating evidence can harm a person charged with a crime "before and not just during the trial, [where] it was used to help indict him," and the indictment leads to a nontrivial period of pretrial detention *Fields v. Wharrie* ("*Fields II*"), 740 F.3d 1107, 1114 (7th Cir. 2014) (citing *Julian v. Hanna*, 732 F.3d 842, 847 (7th Cir. 2013). Here, where Plaintiff spent close to 6 years detained, and where Plaintiff argues that his detention was caused by false statements made

by Defendants, he is not foreclosed from recovery, as a matter of law.  *See Rivera v. Guevara*, 319 F. Supp. 3d 1004, 1043 (N.D. Ill. 2018)(Gottschall, J.)(stating that an instance where a defendant was not released on bond before trial or his acquittal, based on fabricated evidence, faced a "paradigmatic liberty deprivation.").  Based on the totality of the circumstances, it is best for a trier of fact to determine whether his continued detention amounted to a liberty deprivation, in light of  the Detectives' alleged fabrications.

### B.  Malicious Prosecution Claims

In civil litigation, like this case, a rebuttable presumption of probable cause arises after a judicial determination of probable cause. *Washington v. City of Chicago*, 98 F.4th 860, 863 (7th Cir. 2024) (internal citations omitted).  To overcome this presumption, plaintiffs must show "that the officer who sought the warrant [1] 'knowingly or intentionally or with a reckless disregard for the truth, made false statements to the judicial officer, and [2] that the false statements were necessary to the judicial officer's determination that probable cause existed for the arrest.' "  *Whitlock v. Brown*, 596 F.3d 406, 410 (7th Cir. 2010).

Defendants argue Plaintiff cannot show that Defendants made any statement to a judge – let alone a false one – that was necessary to the judge's determination that probable cause existed.  (Dkt. 82 at *6.)  Defendants also assert, to the extent Plaintiff attempts to use Detective Hanrahan 's grand jury testimony against him, Detective Hanrahan is absolutely immune from liability for testimony before a grand jury.  (*Id.* at *6-7) (citing *Rivera v. Guevara*, 319 F. Supp. 3d 1004, 1042 (N.D. Ill. 2018)) (Gottschall, J.) ("[a]bsolute immunity shields a police officer, like most other witnesses, from damages liability under § 1983 for testimony before a grand jury or at trial.")).  In the alternative, Defendants argue, even if the court finds that the detectives made false statements to a judicial officer, Plaintiff has not shown that those statements were "necessary to the judicial officer's determination that probable cause existed." *Washington*, 98 F.4th at 863–64.  Regarding their alleged false statements to

14

the prosecutors, Defendants argue Plaintiff cannot support a but-for finding that their statements caused his prosecution, since the State's Attorney's Office conducted its own independent fact-gathering before filing charges, rather than relying on the statements of the Defendant detectives alone. (Dkt. 82 at *8.)

Plaintiff asserts that his claim for unlawful pretrial detention can survive judicial determinations of probable cause as well as the rebuttable presumption of probable cuase because the bond and grand jury proceedings were tainted by fabricated evidence. (Dkt. 94 at *5) (citing *Manuel v. City of Joliet*, 580 U.S. 357 (2017)( "[I]f the proceeding is tainted—[such as] by fabricated evidence—and the result is that probable cause is lacking, then the ensuing pretrial detention violates the confined person's Fourth Amendment rights....")). Specifically, Plaintiff argues Defendants intentionally caused Woods to make false statements to an ASA to implicate Plaintiff, that the ASA relied on these false statements to approve charges against Plaintiff, and that the ASA and Detective Hanrahan repeated these false statements at the bond hearing and before the grand jury. (Dkt. 94 at *6) This evidence, along with Woods' recantation, Plaintiff argues, is sufficient to permit a reasonable jury to find Defendants intentionally caused false evidence to be presented to the bond judge and the grand jury leading to Plaintiff's unlawful pretrial detention. (*See id.*) In response to Defendants' argument that Detective Hanrahan is protected by absolute immunity for his testimony before a grand jury, Plaintiff argues that immunity does not shield him from the underlying harm of fabricating statements to the prosecutor and coaching Woods' to make a false statement to bring the charges against Plaintiff in the first place. (Dkt. 94 at *7.) Plaintiff concludes, because Defendants intentionally caused Woods to make false statements that were relied upon by prosecutors, a bond judge, and the grand jury, they are responsible for the false showing of probable cause in this case. (*Id.* at 6-7.)

The Court first determines that the Defendants cannot claim absolute immunity for their grand jury testimony because of  material, disputed facts. Officers are not entitled to absolute

immunity when they testify to evidence they fabricated. *See*, e.g., *Avery v. City of Milwaukee*, 847 F.3d 433, 439–40 (7th Cir. 2017) (denying absolute immunity to officers who testified to fabricated confession because "[w]hen the detectives falsified their reports of a nonexistent confession, it was entirely foreseeable that this fabricated 'evidence' would be used to convict [the § 1983 plaintiff] at trial for [the] murder. That was, of course, the whole point of concocting the confession." Because the core of this dispute depends on whether the Detectives Hanrahan and Bouch fabricated evidence they later testified to, the question of whether absolute immunity is applicable is also a disputed question of material fact making summary judgment improper.

Furthermore, there is an outstanding material question as to whether any form of immunity extends to Defendants at all, since Plaintiff does not seek liability based on Detective Hanrahan's' grand jury testimony, but instead seeks to impose liability for the Detectives' pre-testimony, alleged fabrications that were used to secure charges, obtain an indictment, and detain Plaintiff for six years. If the Detectives did in fact fabricate evidence prior to any testimony, such actions are not protected by the absolute immunity Defendants seek to rely on. *See Avery*, 847 F.3d at 441( "[i]f an officer who fabricates evidence can immunize himself from liability by authenticating falsified documentary or physical evidence and then repeating the false 'facts' in his trial testimony, wrongful-conviction claims premised on evidence fabrication would be a dead letter."). In this instance, a jury could easily conclude that the liability stems from the Detectives initial alleged fabrication, as opposed to any testimony they gave, and that such fabrications were the but-for cause of the ASA's approval of charges. A jury could also accept Defendants' account that they did not coach the confession or knowingly provide false information to the ASA. Deciding which scenario is likelier, is best left for the trier of fact. Whether those alleged fabrications were the but-for cause of the ASA's charges, and Plaintiff's indictment, independently raises a question of material fact that makes summary judgment inappropriate.

16

As to whether Plaintiff can show that the alleged fabrications were the but-for cause for the judicial determination of probable cause, the Court also finds such a determination is best reserved for a jury. Where an unbroken causal chain connects the acts of evidence fabrication to an individual's imprisonment, detectives are liable under § 1983 even though their trial testimony, standing alone, would not subject them to damages liability. *Avery*, 847 F.3d at 443. While Defendants argue, even without Woods' false statement, probable cause still existed, Plaintiff argues the prosecutors only obtained a probable cause ruling by relying on fabricated statements by Detective Hanrahan. The proper analysis in this scenario is to begin by considering the information actually "presented to the judicial officer," and determining if, after removing false statements, what remains was sufficient to establish probable cause. *Washington,* 98 F.4th at 875. At minimum, it is a jury question as to whether Woods' alleged false statements were the basis for the judicial probable cause determinations and to determine if, but-for that presentation of evidence, whether there was sufficient evidence to establish probable cause. *See Dominguez v. Hendley*, 545 F.3d 585, 590 (7th Cir. 2008) (stating when there is evidence that officers created false witness statements directly or through undue pressure, the existence of probable cause becomes a jury question).

### C. Qualified Immunity

Defendants finally argue that they are at least entitled to qualified immunity on their federal malicious prosecution claim. Qualified immunity "shields government officials from civil liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Manery v. Lee*, 124 F.4th 1073, 1079 (7th Cir. 2025). There are two inquiries in determining whether qualified immunity applies: [1] whether the facts, taken in the light most favorable to the party asserting the injury show that the officer's conduct violated a constitutional right; and [2] whether the right at issue was 'clearly established' at the time of the officer's alleged misconduct." *Tousis v. Billiot, 84 F.4th 692*, 698 (7th Cir. 2023). When a defense

17

of qualified immunity is raised, courts consider "whether the officer actually had probable cause or, if there is no probable cause, whether a reasonable officer could have mistakenly believed that probable cause existed." *Carmichael v. Village of Palatine*, 605 F.3d 451, 459 (7th Cir.2010).

Defendants argue that even if the detectives needed Woods' identification to establish probable cause for prosecution, it is a certainty that at least arguable probable cause, or mistaken probable cause, existed without it. Defendants argue the involvement of the Cook County State's Attorney in all facets of the investigation and subsequent determination that probable cause existed, without Woods' identification, bars suit in this case. (Dkt. 82 at *15). Plaintiff, by contrast, asserts that Defendants' arguments ignore the central factual dispute in this case – whether or not Defendants intentionally caused Woods to falsely identify Plaintiff as the shooter and thereby deceived prosecutors, a judge, and a grand jury into concluding there was probable cause. (Dkt. 94 at *12.) Plaintiff concludes that Defendants are not entitled to qualified immunity for intentionally creating a false eyewitness statement and then repeating that false statement to prosecutors, a judge, and the grand jury. (*Id.* at 12-13.)

Again, the Court concludes summary judgement is not appropriate here. It is well established that if an officer knowingly or recklessly includes false information in support of a probable cause finding, and that information is material, the officer is not entitled to qualified immunity. *Rainsberger v. Benner*, 913 F.3d 640, 653 (7th Cir. 2019). Here, where the question of immunity rests on the disputed fact of whether the officers knowingly provided false information, the Court cannot grant summary judgment in Defendants' favor. *See Moore v. City of Chicago*, 13 C 483, 2014 WL 2457630, at *7 (N.D. Ill. May 30, 2014) (Holderman, J.). Defendants' primary argument in favor of qualified immunity is the assertion that they "enlisted prosecutors" in deciding whether a prosecution was proper. Fatal to their argument, however, is the fact that Plaintiff directly alleges Defendants created

a false eyewitness statement for the very purpose of deceiving prosecutors into approving charges and maintaining a case. Again, deciding the merits of that allegation, is best left for the trier of fact.

## IV. Conclusion

For the foregoing reasons, the Court denies Defendants' Motion for Summary Judgement [80] as to all claims.


IT IS SO ORDERED.

Date: 3/19/2026

Entered: _____

SHARON JOHNSON COLEMAN
United States District Judge